UNITED STATES of America, Appellee,

v.

**Rafael Ocasio FIGUEROA, a/k/a Papo Guaraguao, Defendant, Appellant.**

No. 89–1745.

United States Court of Appeals, First Circuit.

Submitted Nov. 8, 1989.

Decided March 21, 1990.

As Amended March 26, 1990.

Rafael Ocasio Figueroa, on brief, pro se.

Richard A. Friedman, Atty., Appellate Section, Criminal Div., Dept. of Justice, Daniel F. Lopez Romo, U.S. Atty., Hato

Rey, P.R., and Luis A. Plaza, Asst. U.S. Atty., on brief, for United States.

Before BOWNES, TORRUELLA and SELYA, Circuit Judges.

SELYA, Circuit Judge.

Rafael Ocasio Figueroa (Ocasio) was indicted in September 1987 and charged with having distributed 2000 grams of cocaine on or about August 27, 1987 in violation of 21 U.S.C. § 841(a). He pled guilty and was sentenced to ten years in prison and a four year term of supervised release. He thereafter moved to vacate the supervised release term contending it was illegal. The district court, disagreeing, denied the motion. Ocasio appeals.

The legal issue presented is an issue which, although a kissing cousin of one we have just decided, *see United States v. Ferryman,* 897 F.2d 584 (1st Cir.1990), is not controlled by existing circuit precedent. We affirm the ruling below.

## I.

This case, like *Ferryman,* asks whether a controlled substance offender whose offense was committed during what we have termed the "hiatus period"[1] is subject to post-confinement monitoring, and if so, whether such monitoring shall be in the form of supervised release or special parole. Unlike *Ferryman,* however, the questions are posed in the context of a statute which, in its 1984 incarnation, did not provide for any type of post-confinement monitoring—a difference which we think has decretory significance.

The version of 21 U.S.C. § 841(b) in effect when appellant committed his offense seemed, on its face, plainly to call for a supervised release term. The statute reads in pertinent part:

(B) In the case of a violation of subsection (a) of this section involving—

(ii) 500 grams or more of a mixture or substance containing a detectable amount of—

. . . . .

(II) cocaine ...

such person shall be sentenced to a term of imprisonment which may not be less than 5 years and not more than 40 years.... *Any sentence imposed under this subparagraph shall ... include a term of supervised release of at least 4 years* in addition to such term of imprisonment.... Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person sentenced under this subparagraph. No person sentenced under this subparagraph shall be eligible for parole during the term of imprisonment imposed therein. (Emphasis supplied.)

Anti–Drug Abuse Act of 1986 (ADAA), Pub.L. No. 99–570, Title I, § 1002, 100 Stat. 3207–3 to 3207–4 (1986). For convenience, we will refer to this provision as § 1002.

Section 1002 is the very same statute under which Ferryman was sentenced. We concluded there that the form of postconfinement monitoring applicable to Ferryman's sentence was special parole, the type of monitoring designated by the version of 21 U.S.C. § 841(b)(1)(B) enacted in 1984 and in effect prior to the 1986 ADAA amendments. We reached this conclusion after tracking the legislative history at some length. *See, e.g., Ferryman,* at 586–588. We need not retrace those steps here, but merely recapitulate certain of our conclusions.

In *Ferryman,* we noted that statutes are presumed effective upon passage, but that this rule of thumb for ascertaining congressional intent could be overcome by other indications. *Id.* at 588–589. One problem with concluding that § 1002's provisions for supervised release were meant to go into effect immediately upon ADAA's passage in 1986 was that the supervised release implementing statute, 18 U.S.C.

---

1. In *Ferryman,* we defined the "hiatus period" as comprising the period from October 27, 1986 to November 1, 1987, *Ferryman,* at 588, and eluci- dated the reasons for believing that a statutory lacuna had arguably developed.

§ 3583, did not become law until November 1, 1987. Hence, supervised release was not anchored to any particular format until that later date. *Ferryman*, at 589. Furthermore, another provision of the 1986 amendments, § 1004, called for a switchover from special parole to supervised release, but its effective date was expressly delayed until November 1, 1987 (when the supervised release implementing statute would be on line). We concluded that, where supervised release was to replace special parole, as was true in *Ferryman*, § 1004 "sufficed to delay the effective date of supervised release and thereby preserved the preexisting special parole requirements [until November 1, 1987]." *Ferryman*, at 589 (footnote omitted). We held:

> Given the close similarity between the two types of post-confinement monitoring ... and the fact that standards for the imposition of supervised release were not solidly in place until November 1, 1987 (when 18 U.S.C. § 3583 became effective) we believe it best effectuates Congress' discernable intent, where supervised release is not an innovation but merely a replacement for special parole, to read the statutory interplay as implementing a simultaneous one-time swap of one for the other. In such a circumstance, we agree with the Fifth Circuit that "tying the effective date of the change to the effective date of the implementing statute would seem the more logical arrangement." *United States v. Byrd*, 837 F.2d 179, 181 n. 8 (5th Cir. 1988).

*Ferryman*, at 589.

## II.

The important difference between that case and this case is that Ferryman, whose offense involved less than one kilogram of cocaine, was subject to post-confinement monitoring regardless whether the 1984 version of 21 U.S.C. § 841(b)(1)(B) (calling for special parole) or § 1002 of the 1986 amendments (calling for supervised release) applied. In contrast, since Ocasio's offense involved more than one kilogram of cocaine,[2] were the 1984 version to apply, Ocasio would come within the terms of 21 U.S.C. § 841(b)(1)(A). That subsection, however, pertaining to large scale drug offenses, did not provide for special parole or other post-confinement monitoring—even though special parole was mandated under subsections 841(b)(1)(B) and 841(b)(1)(C) for offenses involving lesser quantities of controlled substances.[3] *See* Pub.L. No. 98–473, Title II, § 502, 98 Stat. 2068 (1984); *see also Ferryman*, at 586.

In *Ferryman*, we were faced, essentially, with discerning congressional intent in choosing *between* special parole and supervised release. *See id.* at 588–589 ("The real question in the section 841(b)(1)(B) milieu is not whether Congress opted for post-confinement monitoring during the hiatus period, but what modality it intended the courts to employ to accomplish such monitoring."). We concluded that the former choice (special parole) was the more logical and was likely intended by Congress to apply. Here, in contrast, the choice is between supervised release, on the one hand, and a complete absence of post-confinement monitoring on the second hand. Section 1004, which we found determinative in *Ferryman*, does not apply, for § 841(b)(1)(A) contained no special parole term to be interchanged for supervised release. This casts a much different light on matters. The various proposals which eventually resulted in the 1986 ADAA amendments consistently provided for post-confinement monitoring and, in the case of large scale offenders, the paralipomena served to reengage the cog which was slipped in 1984, *see supra* note 3. We have no doubt that Congress, from the moment it enacted the 1986 amendments, intended all drug traffickers to be subject to *some*

---

**2.** The indictment charged petitioner with distributing "approximately two thousand (2,000) grams (gross weight) of cocaine." The presentence report stated that the gross weight was 2,372.7 grams, that the net weight was 2,001.7 grams, and that the purity was 88%, "equivalent to a total net weight of 1,753 grams at 100% purity."

**3.** Noting this anomaly, we acknowledged earlier the likelihood "that Congress 'slipped a cog'." *Ferryman*, at 586 n. 1 (quoting *United States v. Sanchez*, 687 F.Supp. 1254, 1256 (N.D.Ill.1988)).

**828**

sort of post-confinement monitoring. Indeed, we unequivocally rejected Ferryman's contention that a monitoring gap should exist during the hiatus period, *Ferryman*, at 588; and we are equally firm in rejecting Ocasio's kindred exhortation. This leaves supervised release as the option of choice—the only option, in a sense—as respects an offense, occurring within the hiatus period, which would have been within the terms of the 1984 version of § 841(b)(1)(A).

We recognize that this case requires us to take one step past the *Ferryman* boundary. In deciding *Ferryman*, we anticipated as much and adumbrated the result. *See id.* at 589–590 n. 4 ("Where section 1004, then, does not implicate the provisions of section 1002, supervised release ... was quite probably effective immediately."). We now make that forecast explicit: in the circumstance at bar, where § 1004's switchover provisions do not apply, there is very little to rebut the presumption that § 1002's provisions were intended to be effective immediately upon passage.[4] We therefore join two sister circuits in holding that, with respect to cocaine distribution offenses committed during the hiatus period and which would have fallen within the ambit of the 1984 version of 21 U.S.C. § 841(b)(1)(A), supervised release was mandatory. *Accord United States v. Gozlon–Peretz*, 894 F.2d 1402, 1404–1406 (3d Cir.1990) (concluding that § 1002's provision for supervised release went into effect immediately upon passage with respect to large scale offenders); *United States v. Torres*, 880 F.2d 113, 114–115 (9th Cir.1989) (per curium) (similar); *but see Ferryman*, at 589 n. 4 (listing representative cases holding *contra* ); *Gozlon–Peretz, supra,* at 587 (listing representative cases holding *contra* ).

### III.

For clarity, we reiterate. Section 1002's provision for supervised release became effective immediately upon passage on October 27, 1986 for offenders, like the present appellant, whose crimes were committed between October 27, 1986 and November 1, 1987 and who would have been sentenced under 21 U.S.C. § 841(b)(1)(A) as amended through 1984 (that is, under the Controlled Substance Penalties Amendments Act of 1984, Pub.L. No. 98–473, Title II, § 502, 98 Stat. 2068 (1984)), were the offenses committed prior to October 27, 1986.

We need go no further. The district court lawfully imposed a supervised release term as part of appellant's sentence. Hence, the court properly denied appellant's motion to correct a purportedly illegal sentence.

*Affirmed.*

---

4. The fact that the implementing statute, 18 U.S.C. § 3583, did not go into effect until November 1, 1987, standing alone, is not enough to convince us that § 1002's provision for supervised release for an offender like appellant (that is, a person involved with quantities of cocaine over one kilogram) was not effective immediately. For one thing, under § 1002, such an offender faced a minimum prison term of five years; the sentence could not be suspended and the offender was ineligible for parole. Hence, a

defendant sentenced thereunder would not begin serving his term of supervised release until after November 1, 1987, that is, until after the supervised release implementing statute was in effect. For another thing, the implementing statute's terms had been drafted in 1984. *See* Pub.L. No. 98–473, Title II, § 212(a)(2), 98 Stat. 1999 (Oct. 12, 1984). So, we are not faced with a lack of fair warning, notwithstanding that the law's effective date was postponed.